2026 PA Super 137

| | | |
|---|---|---|
| TOWNSHIP OF HONEY BROOK | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| | : | |
| v. | : | |
| | : | |
| | : | |
| LES'S AUTO SALVAGE, LLC, AND | : | |
| LESTER J. HELM | : | |
| | : | No. 1750 EDA 2025 |
| Appellants | : | |

Appeal from the Order Entered June 5, 2025
In the Court of Common Pleas of Chester County Civil Division at No(s):
2021-04439-IR

BEFORE:  PANELLA, P.J.E., OLSON, J., and BECK, J.

OPINION BY OLSON, J.:                                    **FILED JUNE 30, 2026**

Appellants, Les's Auto Salvage, LLC ("Les's Auto Salvage") and Lester J. Helm ("Mr. Helm"), appeal from the June 5, 2025 order entered in the Court of Common Pleas of Chester County that held Les's Auto Salvage and Mr. Helm in contempt of the trial court's July 10, 2023 permanent injunction order.[1]  In

---

[1] The June 5, 2025 order was timestamped as having been filed on June 4, 2025, but notice was not provided to the parties, pursuant to Pennsylvania Rule of Civil Procedure 236, until June 5, 2025.  **See** Pa.R.Civ.P. 236(b) (stating, "[t]he prothonotary shall note in the docket the giving of the notice").  Therefore, the trial court order was entered on June 5, 2025.  **See** Pa.R.A.P. 108(b) (stating, "[t]he date of entry of an order in a matter subject to the Pennsylvania Rules of Civil Procedure shall be the date on which the clerk makes the notation in the docket that written notice of entry of the order has been given as required by [Rule] 236(b)").

We further note that this appeal is properly before this Court pursuant to 42 Pa.C.S.A. § 742.  **See** 42 Pa.C.S.A. § 742 (stating, "[this Court] shall have

the June 5, 2025 order, the trial court also amended its July 10, 2023 permanent injunction order such that Les's Auto Salvage and Mr. Helm were no longer permitted to cure the underlying conditions which, ultimately, led to the issuance of a permanent injunction on July 10, 2023, as discussed in greater detail *infra*. After careful review, we affirm.

The record reveals that, on June 15, 2021, Honey Brook filed a petition seeking preliminary and permanent injunctions to enjoin Les's Auto Salvage and Mr. Helm from continuing to violate Honey Brook's junkyard and streets ordinances through the use of the real property located in the Township of Honey Brook, Chester County, Pennsylvania that was owned by Mr. Helm and used in the operation of his business, Les's Auto Salvage, LLC. In its petition, Honey Brook alleged that Les's Auto Salvage and Mr. Helm violated the junkyard ordinance because, *inter alia*, a "foul odor of diesel fuel" could be detected when entering the property, "a puddle of what appeared to be fuel" was noted on the ground at the real property, "the main aisle into the junkyard had automobile parts lying in the road, was filled with wet mud and stagnant water, and did not contain [a] clear space [that was twenty feet in width,]"

_____

exclusive appellate jurisdiction of all appeals from final orders of the courts of common pleas, regardless of the nature of the controversy or the amount involved, except such classes of appeals as are by any provision of this chapter within the exclusive jurisdiction of [our] Supreme Court or the Commonwealth Court"). This matter involves an appeal of a contempt order in an action brought by the Township of Honey Brook ("Honey Brook"), a political subdivision, against Les's Auto Salvage and Mr. Helm. We do not find that this type of action falls within the exclusive jurisdiction of the Commonwealth Court. **See generally**, 42 Pa.C.S.A. § 762. As such, we have jurisdiction to decide this appeal.

"conditions [of the real property] would not permit firefighting equipment to access the interior of the junkyard in [the event] of a fire[,"] and "there was no fence enclosing the rear of the [real property]." Petition for Preliminary and Permanent Injunctions, 6/15/21, at ¶¶33-36. Honey Brook alleged that Les's Auto Salvage and Mr. Helm violated the streets ordinance by storing vehicles and junk in the public right-of-way and by blocking access to the public right-of-way with vehicles entering the real property or unloading junk onto the real property. *Id.* at ¶¶82-86. On August 9, 2021, Les's Auto Salvage and Mr. Helm filed an answer to Honey Brook's petition. On August 17, 2021, the parties entered into a consent agreement and stipulation ("consent agreement") in which Les's Auto Salvage and Mr. Helm agreed that they were in violation of various provisions of Honey Brook's junkyard and streets ordinances. As part of the consent agreement, Les's Auto Salvage and Mr. Helm also agreed "to bring the [p]roperty into compliance with various requirements of the [j]unkyard [o]rdinance over the coming 90 days and to maintain the [p]roperty and operate the junkyard in full compliance with the [j]unkyard [o]rdinance and [s]treets [o]rdinance." Consent Agreement, 8/17/21, at ¶14. On August 17, 2021, the trial court approved the consent agreement and memorialized the agreement in a trial court order. Trial Court Order, 8/17/21.

On October 29, 2021, Honey Brook filed a petition to enforce the terms of the consent agreement and to find Les's Auto Salvage and Mr. Helm in contempt for violating the trial court's August 17, 2021 order. On November

3, 2021, the trial court entered a rule against Les's Auto Salvage and Mr. Helm to show cause as to why Honey Brook was not entitled to the relief it sought in the enforcement petition. On November 18, 2021, Les's Auto Salvage and Mr. Helm filed an answer to Honey Brook's petition. On May 13, 2022, upon conclusion of a hearing on the matter, the trial court entered a preliminary injunction enjoining Les's Auto Salvage and Mr. Helm "from operating the [junkyard] business at issue in the Township of Honey Brook" and found Les's Auto Salvage and Mr. Helm to have violated the terms of the August 17, 2021 trial court order. Trial Court Order, 5/13/22, at ¶¶1-2. The trial court also directed Les's Auto Salvage and Mr. Helm to pay attorneys' fees and costs to Honey Brook in the amount of $16,500.00.[2] *Id.* at ¶2.

After concluding an evidentiary hearing on the permanency of the injunction, the trial court, on December 5, 2022, scheduled a telephone conference call to "facilitate a final settlement of this case [and to] set a new deadline for the parties' proposed findings of fact/conclusions of law and proposed final orders, if necessary." Trial Court Order, 12/5/22. On July 10, 2023, the trial court approved, and accepted, the stipulation entered into

---

[2] The trial court directed Honey Brook to refrain from seeking enforcement of the preliminary injunction until July 1, 2022. Trial Court Order, 5/13/22, at ¶3. The trial court further stated that if Les's Auto Salvage and Mr. Helm were in "full compliance of the August 17, 2021 order on July 1, 2022[,] and continuously remain[ed] in compliance until the August 25, 2022 hearing[, which was scheduled to determine the necessity of making the injunction permanent, the] obligation to pay [attorneys'] fees and costs [would] be reduced to $6,500.00[.]" *Id.*

between the parties on May 15, 2023. Trial Court Order, 7/10/23. Pursuant to the stipulation, the trial court granted Honey Brook's request for a permanent injunction pertaining to the junkyard property. *Id.* at ¶A. The trial court order set forth the agreed-upon conditions of operation for the junkyard, and the trial court retained jurisdiction over the matter. *Id.* at ¶¶B and D.

On October 7, 2024, Honey Brook filed a motion for civil contempt sanctions and a request to amend and enforce the July 10, 2023 permanent injunction order. Honey Brook asserted that, "commencing with [its] December 8, 2023 scheduled inspection [of the junkyard property, Honey Brook] began to observe conditions in the frontage of the [p]roperty that both violated the operational conditions of the [July 10, 2023 permanent injunction order,] and appeared to evidence that [Les's Auto Salvage and Mr. Helm were] engaging in the business of operating a junkyard, in violation of [the permanent injunction order]." Motion for Civil Contempt Sanctions, 10/7/24, at ¶22. In its contempt motion, Honey Brook requested, *inter alia*, that the trial court find Les's Auto Salvage and Mr. Helm in contempt of the July 10, 2023 permanent injunction order, impose civil penalties for the alleged contempt violations, and amend the permanent injunction order "to permanently and unconditionally enjoin [Les's Auto Salvage and Mr. Helm] from operating a junkyard on the [p]roperty, with such amended order to include a requirement that all junk be removed from the [p]roperty and the [p]roperty be restored to a [permitted use] within 60 days of the date of such

amended order[.]" Honey Brook also requested that the trial court grant other relief it deemed appropriate, including "charges of criminal contempt with penalties of fines and imprisonment." *Id.* at Wherefore Clause.

The trial court scheduled a hearing on Honey Brook's contempt motion for March 26, 2025. At the March 2025 hearing, the parties reached an oral agreement to settle the matter and, as the trial court noted, "set forth the material terms of their settlement agreement [on the record] intending to later execute a formal document[.]" Trial Court Order, 3/27/25. At the hearing, Mr. Helm executed a statement in which he acknowledged "there is no legal right to a junkyard use" on the real property and that the real property "can only be used in accordance with the township's zoning regulations[.]" Defendant's Exhibit 1, 3/26/25. The parties, however, failed to subsequently execute a settlement agreement.

At a June 3, 2025 hearing, the trial court granted the motion for contempt. In doing so, the trial court, *inter alia*, affirmed its July 10, 2023 permanent injunction order, terminated the ability by Les's Auto Salvage and Mr. Helm to cure the underlying conditions, directed Les's Auto Salvage and Mr. Helm to pay $13,000.00 in fines and $10,352.00 in attorneys' fees to

Honey Brook, and ordered Les's Auto Salvage and Mr. Helm to clear the property of "all salvage and junk" within 90 days.[3] This appeal followed.[4]

Les's Auto Salvage and Mr. Helm raise the following issue for our review:

Did the [trial] court abuse its discretion in granting [Honey Brook's] motion for civil contempt sanctions by, in addition to fines and attorneys' fees, issuing a permanent, non-curable injunction that prevents [Les's Auto Salvage and Mr. Helm] from operating [a] junkyard on [the real] property going forward?

Les's Auto Salvage's and Mr. Helm's Brief at 2.

Les's Auto Salvage and Mr. Helm challenge the trial court's contempt order on the grounds that there was insufficient evidence to support a finding that they violated the July 10, 2023 permanent injunction order and that the trial court was not permitted to impose a sanction that terminated the ability by Les's Auto Salvage and Mr. Helm to cure the underlying condition. *Id.* at 25-51.

_____

[3] The trial court's original order finding Les's Auto Salvage and Mr. Helm in contempt was entered on June 4, 2025, but incorrectly identified the July 10, 2023 order as a "preliminary injunction" order. Trial Court Order, 6/4/25. The trial court entered an amended order on June 5, 2025, correctly identifying the July 10, 2023 order as a "permanent injunction" order. Trial Court Order, 6/5/25.

The June 5, 2025 order is immediately appealable as a final order because the order imposed sanctions on Les's Auto Salvage and Mr. Helm by, *inter alia*, ordering them to pay attorneys' fees and costs, and no further trial court order was required before the sanctions took effect. *See Foulk v Foulk*, 789 A.2d 254, 258 (Pa. Super. 2001).

[4] Les's Auto Salvage and Mr. Helm, as well as the trial court, complied with Pennsylvania Rule of Appellate Procedure 1925.

Our standard of review over findings of contempt in the trial court is "extremely narrow." This Court will reverse only upon a showing of an abuse of discretion. A trial court abuses its discretion in this context if it misapplies the law or exercises its discretion in a manner lacking reason.

**Fetzer v. Fetzer**, 336 A.3d 1058, 1064 (Pa. Super. 2025) (citations and some quotation marks omitted).

For centuries, courts have had the "inherent power to enforce compliance with their lawful orders through civil [or criminal] contempt[.]" **Cnty. of Fulton v. Sec'y of the Commonwealth**, 292 A.3d 974, 1003 (Pa. 2023); **see also Commonwealth v. Bowden**, 838 A.2d 740, 760 (Pa. 2003).

Proceedings for contempt are of two classes - those prosecuted to preserve the power and vindicate the dignity of the courts and to punish for disobedience of their orders, and those instituted to preserve and enforce the rights of private parties to suits, and to compel obedience to orders and decrees made for enforcing the rights and administering the remedies to which the court has found them to be entitled. The former are criminal and punitive in their nature, and the government, the courts, and the people are interested in their prosecution. The latter are civil, remedial[,] and coercive in their nature, and the parties chiefly in interest as to their conduct and prosecution are the individuals whose private rights and remedies they were instituted to enforce.

**Penn Anthracite Mining Co. v. Anthracite Miners of Pennsylvania**, 174 A. 11, 13 (Pa. Super. 1934), *aff'd*, 178 A. 291 (Pa. 1935).

"There is nothing inherent in a contemptuous act or refusal to act which classifies that act as 'criminal' or 'civil'. The distinction between criminal and civil contempt is rather a distinction between two permissible judicial

- 8 -

responses to contumacious behavior."[5] *Diamond v. Diamond*, 715 A.2d 1190, 1194 (Pa. Super. 1998), *quoting In re Martorano*, 346 A.2d 22, 27-29 (Pa. 1975). Within the context of a contempt proceeding, a trial court, in exercising its inherent right to enforce its orders, may impose criminal contempt sanctions, civil contempt sanctions, or both. *Martorano*, 346 A.2d at 28.

"The proper classification of a contempt adjudication is important because it governs the procedures that must be followed." *Gunther v. Bolus*, 853 A.2d 1014, 1016 (Pa. Super. 2004), *appeal denied*, 853 A.2d 362 (Pa. 2004); *see also Bredbenner v. Hall*, 353 A.3d 683, 686 (Pa. 2026) (Opinion Accounting Judgment of Court) (stating, "[i]n any contempt proceeding, the species of contempt being pursued must be clear"). "Even where the same facts might give rise to criminal as well as civil contempt, each has its own distinct procedures and confers distinct procedural rights[. The] two may not be casually commingled." *Bredbenner*, 353 A.3d at 386, *citing Barrett v. Barrett*, 470 Pa. 253, 386 A.2d 616, 619 (1977). "If the adjudication is criminal, then the contemnor is entitled to all of the procedural rights and safeguards afforded to criminal defendants, including the right to trial by jury." *Gunther*, 853 A.2d at 1016; *see also Bredbenner*, 353 A.3d at 386 (stating,

---

[5] "Criminal contempt occurs in two ways: direct and indirect. In general, contempt is direct when committed in the court's presence and indirect when committed beyond its presence." *In re Davis*, 302 A.3d 166, 171 (Pa. Super. 2023) (citation and original quotation marks omitted).

"[i]n a criminal contempt proceeding, the [contemnor] must be provided with the essential procedural safeguards of the criminal law" (original quotation marks omitted; *citing* **Barrett**, 368 A.2d at 619)); **Cipolla v. Cipolla**, 398 A.2d 1053, 1056 (Pa. Super. 1979) (recognizing that, in a criminal contempt proceeding, the contemnor is entitled to, *inter alia*, admission to bail, the right to be notified of the charges, the right to prepare a defense, the right to a speedy and public trial by an impartial jury, the right to assistance of counsel, and the right to have the elements necessary to establish the criminal contempt proven beyond a reasonable doubt). Thus, "[t]he civil-criminal classification of contempt exists solely for determination of a contemnor's procedural rights and a court's sentencing options." **Diamond**, 715 A.2d at 1194. In other words, if a contemnor is not provided with his or her criminal procedural rights, then a trial court cannot impose a criminal contempt sanction in response to a contemnor's failure to adhere to a trial court order. Conversely, if a trial court has imposed a criminal contempt sanction, then the contemnor must have been afforded his or her criminal procedural rights or the criminal contempt sanction is invalid.

In classifying the type of contempt, "it is the judicial response to the violation that determines whether the contempt is civil or criminal." **Gunther**, 853 A.2d at 1016.

> These judicial responses are classified according to the dominant purpose of the court. If the dominant purpose is to prospectively coerce the contemnor to comply with an order of the court, the adjudication is civil. If, however, the dominant purpose is to punish the contemnor for disobedience of the court's order or

some other contemptuous act, the adjudication of contempt is criminal.

Dominant purpose of coercion or punishment is expressed in the sanction imposed. A civil adjudication of contempt coerces with a conditional or indeterminate sentence of which the contemnor may relieve himself [or herself] by obeying the court's order, while a criminal adjudication of contempt punishes with a certain time of imprisonment or a fine which the contemnor is powerless to escape by compliance.

*Diamond*, 715 A.2d at 1194 (emphasis omitted); *see also Bowden*, 838 A.2d at 760 (stating, "contempt can be criminal or civil in nature, and depends on whether the core purpose of the sanction imposed is to vindicate the authority of the court, in which case the contempt is criminal, or whether the contempt is to aid the beneficiary of the order being defied, in which case it is civil"); *Bredbenner*, 353 A.3d at 686-687 (stating, "Civil contempt aims to coerce compliance with a court order. Criminal contempt punishes [the] violation of an order and vindicates the court's authority." (*citing Barrett*, 368 A.2d at 619-620)); *Cnty. of Fulton*, 292 A.3d at 1004 (stating, "the distinction depends upon whether the sanctions' dominant purpose is to punish for the violation of a court order [(criminal contempt)] or to coerce into compliance with the order [or compensate the complainant (civil contempt)]" (original quotation marks and footnote omitted)). One of "the [key] characteristic[s] that distinguishes civil [contempt] from criminal contempt is the ability of the contemnor to purge himself [or herself] of contempt by complying with the court's directive." *Fetzer*, 336 A.3d at 1066 (citation and original brackets omitted). "Stated simply, in a civil contempt order the

- 11 -

contemnor is able to purge himself [or herself] of the contempt and thus holds the keys to the jailhouse door." **Diamond**, 715 A.2d at 1194; **see also Knaus v. Knaus**, 127 A.2d 669, 673 (Pa. 1956) (stating, the contemnor "carries the keys to his [or her] own prison in his [or her] pocket").

"Sanctions for civil contempt can be imposed for one or both of two purposes: to compel or coerce obedience to a court order and/or to compensate the contemnor's adversary for injuries resulting from the contemnor's noncompliance with a court order." **Mrozek v. James**, 780 A.2d 670, 674 (Pa. Super. 2001); **see also Bowden**, 838 A.2d at 760 (stating, "[c]ivil contempt orders, in turn, usually occur as one of two sub-species: compensatory or coercive"). Compensatory civil contempt sanctions, as the name suggests, involve an award of "compensation that is paid to the party whom the contempt has harmed." **Bowden**, 838 A.2d at 760-761. The compensation, which is meant to reimburse the complainant for losses, such as attorneys' fees and costs due to non-compliance, is viewed as an unconditional fine because it is a sum certain and beyond the contemnor's ability to escape. **Diamond**, 715 A.2d at 1194 (indicating, the term "unconditional" means that the sanction is "certain" or fixed and is beyond the contemnor's power to escape, *i.e.*, without a purge condition); **see also Stahl v. Redcay**, 897 A.2d 478, 487 (Pa. Super. 2006) (stating, a court may impose "the remedial punishment of [an unconditional] fine payable to an aggrieved complainant as compensation for the special damages he [or she] may have sustained by reason of the contumacious behavior of the [contemnor]"

(citation and original brackets omitted)); *Gunther*, 853 A.2d at 1016 (stating, "a court may require the contemnor to compensate the opposing party for losses incurred as a result of the violation or reimburse the party's attorneys' fees and costs"). The amount of the compensation or unconditional fine must be directly tied to the injured party's losses. *Sutch v. Roxborough Mem'l Hosp.*, 142 A.3d 38, 68 (Pa. Super. 2016) (reiterating that, when compensation is intended as the sanction, "a fine is imposed, payable to the complainant[, with the amount of the fine] based upon evidence of the complainant's actual loss"), *appeal denied*, 163 A.3d 399 (Pa. 2016).

Coercive civil contempt sanctions, on the other hand, are "intended to coerce the [contemnor] into compliance with the court's order through incarceration and/or monetary punishment." *Bowden*, 838 A.2d at 761. This type of sanction is typically in the form of a conditional fine payable to the court or a conditional term of imprisonment. *Id.*; *see also Gunther*, 853 A.2d at 1016. As indicated *supra*, a key characteristic of a coercive civil contempt sanction that takes it outside the realm of a punitive or criminal contempt sanction is the inclusion of a specific purge condition that the contemnor may satisfy to avoid the sanction. *Bredbenner*, 353 A.3d at 387-688 (stating, "[t]he condition that allows the [contemnor] to be released from the [conditional] sentence [or fine] is colloquially known as the 'purge condition,' as its performance purges the obligor's contempt"); *see also Knaus*, 127 A.2d at 673. This "purge condition" must be within the contemnor's power to perform or within his or her ability to pay, otherwise

the sanction is considered to be punitive. *Bredbenner*, 353 A.3d at 687, *citing Barrett*, 368 A.2d at 620. When fashioning a coercive civil contempt sanction, the court must consider (1) "the character and magnitude of the harm threatened by continued contumacy, and the probable effectiveness of any suggested sanction in bringing about the result desired[;]" and (2), in the case of imposing a conditional fine, "the amount of [the contemnor's] financial resources and the consequent seriousness of the burden to that particular [contemnor]." *Bowden*, 838 A.2d at 761. "In imposing sanctions for coercive purposes, the court must exercise the least possible power to the end proposed." *Cnty. of Fulton*, 292 A.3d at 1004 (footnote omitted).

> In civil contempt proceedings the burden is on the complaining party to prove noncompliance by a preponderance of the evidence. The corollary of this proposition is that the order which is said to have been violated must be specific and definite.
>
> Mere noncompliance with a court order is not by itself sufficient to prove contempt; rather, the complaining party must prove:
>
> (1) That the contemnor had notice of the specific order or decree which he [or she] is alleged to have disobeyed;
>
> (2) That the act constituting the contemnor's violation was volitional; and
>
> (3) That the contemnor acted with wrongful intent.

*Id.* (footnotes, brackets and quotation marks omitted).

> To establish a claim of indirect criminal contempt, the evidence must be sufficient to establish the following four elements:
>
> (1) the order [in question] must be definite, clear, specific and leave no doubt or uncertainty in the mind of the person to whom it was addressed of the conduct prohibited; (2) the

contemnor must have had notice of the specific order or decree; (3) the act constituting the violation must have been volitional; and (4) the contemnor must have acted with wrongful intent.

***Commonwealth v. Ashton***, 824 A.2d 1198, 1203 (Pa. Super. 2003) (citation omitted); ***see also Commonwealth v. McMullen***, 961 A.2d 842, 849 (Pa. 2008).[6]    The burden to establish criminal contempt rests with the Commonwealth or the party requesting the trial court impose a criminal contempt sanction.  ***Commonwealth v. Brambaugh***, 932 A.2d 108, 110 (Pa. Super. 2007).

Although the elements necessary to establish civil contempt and indirect criminal contempt are analogous, the burdens of proof differ.  The elements necessary to establish civil contempt must be shown by a preponderance of the evidence while the elements necessary to establish indirect criminal contempt must be proven beyond a reasonable doubt.  ***Cnty. of Fulton***, 292 A.3d at 1004 (stating, "[i]n civil contempt proceedings[,] the burden is on the complaining party to prove noncompliance by a preponderance of the evidence"); ***see also Commonwealth v. Stevenson***, 283 A.3d 196, 205 (Pa. 2022) (stating, "when one is charged with indirect [criminal] contempt, those charging such contempt are put to the usual proofs required to convict

_____

[6] The actions by Les's Auto Salvage and Mr. Helm at issue in the case *sub judice* did not occur in the presence of the trial court and, as such, the actions cannot implicate a direct criminal contempt.  Therefore, we limit our discussion to indirect criminal contempt.

for any [criminal] charge" (citation, original quotation marks, and brackets omitted)).

We begin our review by examining whether the trial court held Les's Auto Salvage and Mr. Helm in civil or criminal contempt (or combination thereof) of its July 10, 2023 order. On August 17, 2021, the trial court approved the consent agreement entered into by the parties under which Les's Auto Salvage and Mr. Helm agreed that the real property was not in compliance with certain junkyard and streets ordinances enacted by Honey Brook. Consent Agreement and Stipulation, 8/17/21, at ¶¶5-11; **see also** Trial Court Order, 8/17/21. As part of the consent agreement, Les's Auto Salvage and Mr. Helm agreed to bring the real property into compliance with the zoning ordinances beginning on August 17, 2021, and continuing through November 15, 2021 (a 90-day period). Consent Agreement and Stipulation, 8/17/21, at ¶14. "Upon [Les's Auto Salvage's and Mr. Helm's] satisfactory and timely completion of the action items and adherence to the requirements set forth in [the consent agreement]," Honey Brook agreed to issue Les's Auto Salvage and Mr. Helm a license to operate a lawful junkyard business on the real property. *Id.* at ¶18.

On May 13, 2022, the trial court found Les's Auto Salvage and Mr. Helm in contempt of its August 17, 2021 order that required Les's Auto Salvage and Mr. Helm to bring the real property into compliance with the zoning ordinances and obtain a business license to continue operations. Trial Court Order, 5/13/22, at ¶1. As such, the trial court granted Honey Brook a preliminary

injunction that enjoined Les's Auto Salvage and Mr. Helm from operating the junkyard business on the real property and ordered Les's Auto Salvage and Mr. Helm to pay attorneys' fees and costs in the amount of $16,500.00. *Id.* at ¶2. The preliminary injunction included a purge condition under which Honey Brook was directed to refrain from enforcing the preliminary injunction until July 1, 2022, in order to provide Les's Auto Salvage and Mr. Helm an opportunity to bring the property into full compliance with the August 17, 2021 order. *Id.* at ¶3. If Les's Auto Salvage and Mr. Helm complied with the August 17, 2021 order by July 1, 2022, and "continuously remain[ed] in compliance until the [hearing that was scheduled to address the permanency of the injunction, then the attorneys' fees and costs Les's Auto Salvage and Mr. Helm were obligated to pay Honey Brook would] be reduced to $6,500.00[.]" *Id.*

On August 24, 2022, the trial court conducted an evidentiary hearing on the matter. A subsequent evidentiary hearing was conducted on September 23, 2022. Over the next several months, the trial court engaged in a series of conference calls with the parties intended to facilitate resolution of the dispute and arrange submission deadlines for proposed factual findings, proposed conclusions of law, and draft dispositional orders. On March 31, 2023, the trial court directed the parties to "submit to the court a stipulation with agreed-upon recommended orders for the [trial] court[,] as well as separate memoranda on the two issues on which the parties agree [the trial] court should rule." Trial Court Order, 3/31/23. On July 10, 2023, the trial court granted Honey Brook a permanent injunction that enjoined Les's Auto

Salvage and Mr. Helm from operating a junkyard business on the real property. Trial Court Order, 7/10/23. The trial court, again, created a purge condition by which Les's Auto Salvage and Mr. Helm could avoid the permanent injunction, and resume operations, if it satisfied "the conditions for operation of a junkyard on the [real p]roperty" and paid "all past due amounts" owed to Honey Brook. *Id.* at ¶A.

On October 7, 2024, as discussed *supra*, Honey Brook filed a motion for civil contempt sanctions and to amend and enforce the trial court's July 10, 2023 order because Les's Auto Salvage and Mr. Helm, in Honey Brook's opinion, failed to comply with the July 10, 2023 order. Ultimately, the trial court conducted a hearing on the motion on June 3, 2025. On June 5, 2025, the trial court granted Honey Brook's motion for contempt sanctions and, in doing so, ordered the following:

1. [The trial] court's order entered July 10, 2023[,] granting the permanent injunction is affirmed and the ability to cure the underlying conditions is terminated;

2. [Les's Auto Salvage and Mr. Helm] shall within [90] days pay $13,000.00 in fines for continuing to operate a salvage and junkyard in violation of the injunction;

3. [Les's Auto Salvage and Mr. Helm] shall within [90] days pay $10,352.00 in [attorneys'] fees to [Honey Brook];

4. [Les's Auto Salvage and Mr. Helm] shall clear the [real] property located [in the Township of Honey Brook] of all salvage and junk within [90] days. Should [Les's Auto Salvage and Mr. Helm] fail to comply with this order, [Honey Brook] may enter the [real] property upon [24] hours of written notice and clear the [real] property of all salvage or junk. [Les's Auto Salvage and Mr. Helm] shall reimburse

[Honey Brook] for any reasonable costs incurred by [Honey Brook] in clearing the [real] property;

5. This order is without prejudice to [Les's Auto Salvage's and Mr. Helm's] rights to seek any variances, approval of nonconforming use, or the like for the [real] property; and

6. [Les's Auto Salvage and Mr. Helm are] subject to further fines for continued operation of the [real] property in violation of [the trial] court's injunction.

Trial Court Order, 6/5/25 (extraneous capitalization omitted).

Upon review, we find that that two of the sanctions imposed on Les's Auto Salvage and Mr. Helm had the dominant purpose of punishing Les's Auto Salvage and Mr. Helm for their non-compliance with the trial court's July 10, 2023 permanent injunction order and, thus, were indirect criminal contempt sanctions.[7] In particular, the sanctions that affirmed the permanent injunction (*Id.* at ¶1) and required Les's Auto Salvage and Mr. Helm to pay $13,000.00 in fines (*Id.* at ¶2) had the dominant purpose of punishing Les's Auto Salvage and Mr. Helm for their failure to comply with the permanent injunction order because neither sanction included a purge condition by which Les's Auto

---

[7] Paragraphs 1 – 3 of the trial court's June 5, 2025 order, as set forth *supra*, impose sanctions on Les's Auto Salvage and Mr. Helm, as discussed in greater detail *infra*. Paragraph 4 of the trial court order is functionally a part of the sanction imposed in Paragraph 1, as it explains the punitive consequences for the failure by Les's Auto Salvage and Mr. Helm to comply with the permanent injunction within 90 days, *i.e.*, they will be responsible for the clean-up costs. Paragraphs 5 and 6 of the trial court order do not impose sanctions but, rather, set forth Les's Auto Salvage's and Mr. Helm's rights regarding future use of the real property and put Les's Auto Salvage and Mr. Helm on notice that they may be subject to future fines if they fail to comply with the permanent injunction.

Salvage and Mr. Helm could free themselves from the sanction. In affirming the July 10, 2023 permanent injunction, the trial court removed the ability for Les's Auto Salvage and Mr. Helm to "lift" the permanent injunction by complying with the May 13, 2022 court order. The removal of the purge condition resulted in an injunction that permanently enjoined Les's Auto Salvage and Mr. Helm from operating a junkyard business on the real property at any time in the future. The $13,000.00 fine punished Les's Auto Salvage and Mr. Helm for thirteen past instances of non-compliance with the July 10, 2023 permanent injunction order by imposing a $1,000.00 fine per instance of non-compliance. These sanctions were not intended to coerce Les's Auto Salvage and Mr. Helm into complying with the ordinances, which would allow them to continue business operations but, rather, resulted in the permanent cessation of the junkyard business without the ability to cure. Les's Auto Salvage and Mr. Helm were simply required to "clear" the real property by removing the salvage and junk or Honey Brook would have the right to undertake such efforts and seek reimbursement for the costs. As such, Les's Auto Salvage, as a business entity, and Mr. Helm, as an individual, were each entitled to certain constitutionally-guaranteed criminal procedural rights.[8] As

---

[8] Because a trial court possesses inherent power to enforce its orders by imposing criminal sanctions, civil sanctions, or a combination, an individual may be unaware of his or her criminal procedural rights, if any, until after the trial court imposes its sanctions. In other words, an individual may be unaware he or she is entitled to constitutionally-guaranteed criminal procedural rights until after the trial court imposed a criminal contempt sanction.

discussed *supra*, those rights included, *inter alia*, the right to be notified of the charges, the right to prepare a defense, the right to the assistance of counsel, and the right to have the elements necessary to establish the indirect criminal contempt proven beyond a reasonable doubt. **Cipolla**, 398 A.2d at 1056; **see also Diamond**, 715 A.2d at 1196 n.10; **Gunther**, 853 A.2d at 1016.

One instance where the rights afforded Les's Auto Salvage and Mr. Helm differed, however, was the right to a public and speedy trial by an impartial jury, if so requested. "The right to a jury trial under the Sixth Amendment to the United States Constitution and Article I, §§ 6, 9 of the Pennsylvania Constitution applies when a criminal defendant faces a sentence of imprisonment exceeding six months." **Commonwealth v. McMullen**, 961 A.2d 842, 847 (Pa. 2008). A trial court may impose a fine on a business entity, such as Les's Auto Salvage, as a sanction for indirect criminal contempt, but a business entity cannot be imprisoned. As such, Les's Auto Salvage does not enjoy the constitutionally-guaranteed criminal procedure right to a jury trial in this instance. Mr. Helm, however, as an individual, faced the possibility of the trial court imposing a fine or a term of imprisonment (or both) as punishment for his indirect criminal contempt and, therefore, Mr.

Helm enjoyed the right to have an impartial jury decide whether, or not, his actions constituted indirect criminal contempt beyond a reasonable doubt.[9]

Les's Auto Salvage and Mr. Helm do not dispute that they had notice of both the July 10, 2023 permanent injunction order and their obligation to fully comply with the permanent injunction order and, ultimately, the zoning ordinances. Les's Auto Salvage's and Mr. Helm's Brief at 33. Rather, Les's Auto Salvage and Mr. Helm assert that Honey Brook failed to establish that the violation of the July 10, 2023 permanent injunction order was volitional and undertaken with wrongful intent. *Id.* at 34. Les's Auto Salvage and Mr. Helm contend that Honey Brook's inspections of the real property "on August 23, 2023, October 6, 2023, and November 7, 2023, found that the front of the [real property] was clear of junk, junk vehicles, excessive tow trucks, or any vehicles parked within [15 feet] of the edge of the cartway, in compliance with those specific operational conditions of the [July 10, 2023 permanent injunction order]." *Id.* Les's Auto Salvage and Mr. Helm argue that it "completed many of the tasks required and that financial constraints and

_____

[9] In ***Commonwealth v. McMullen***, 961 A.2d 842 (Pa. 2008), our Supreme Court held that Section 4136(b) of the Judicial Code, which provided a maximum penalty of 15-days' imprisonment for indirect criminal contempt, to be unconstitutional because Section 4136(b) "unconstitutionally restrict[ed] the court's ability to punish for contempt." ***McMullen***, 961 A.2d at 850; ***see also*** 42 Pa.C.S.A. § 4136(b) (stating, "punishment for [indirect criminal contempt] may be by fine not exceeding $100[.00] or by imprisonment not exceeding 15 days in jail of the county where the court is sitting, or both, in the discretion of the [trial] court"). As such, it was within the trial court's discretion to impose a term of imprisonment on Mr. Helm that exceeded six months and, thus, triggered Mr. Helm's right to a trial by jury.

adverse weather conditions had hindered and delayed [the] full completion."

***Id.***

One of the conditions Les's Auto Salvage and Mr. Helm were required to satisfy was to fully enclose "the entire junkyard operation and all equipment involved therein"

> by a fence or wall, a minimum of [8 feet] in height that forms a substantially solid visible barrier, with acceptable fencing to include either heavy-duty steel chain link fence with privacy screens/slats, or solid wood stockade fence.

Consent Agreement and Stipulation, 8/17/21, at ¶14(c)(i); ***see also*** Trial Court Order, 8/17/21.  The parties stipulated that "as of June [3, 2025,] the junkyard [] property ha[d] not yet been fully enclosed by a fence or wall[.]" N.T., 6/3/25, at 8.  At the June 3, 2025 hearing, Mr. Helm stated that "I guess [in] 2022, I was court-ordered to fence in the whole yard[,]" thereby acknowledging that he had notice of the compliance requirements.  N.T., 6/3/25, at 77.  Mr. Helm testified that, as of the June 3, 2025 hearing, the real property was not enclosed with fencing, as required by the junkyard ordinance.  ***Id.*** at 72-73.  Mr. Helm testified that he needed additional time to bring the entire property into compliance, stating that he could have everything done by the end of July 2025.  ***Id.*** at 74.  He explained that the delay was caused by the weather.  ***Id.*** at 74-75.  On cross-examination, when asked if weather was the reason he failed to install the required fencing around the property for the last three or four years (since being ordering to do so in 2021), Mr. Helm responded, "[p]robably money."  ***Id.*** at 98.  Counsel for

- 23 -

Honey Brook pointed out that Mr. Helm inherited money upon his mother's death and that he chose to purchase a new tract of real property rather than use the inheritance to install the fencing, to which Mr. Helm responded, "It was [my money] to do with what I pleased." *Id.* Mr. Helm further stated that his delay with installing the fencing was due "probably" to a lack of help. *Id.* at 100. When asked when he last had "help," Mr. Helm responded that friends helped him a few months ago with installing a portion of the fencing. *Id.*

The record reveals that Les's Auto Salvage and Mr. Helm received notice of the July 10, 2023 permanent injunction and their obligations thereunder, as well as the accusations lodged against them in Honey Brook's motion for contempt. The parties also had ample time to prepare a defense and were represented by counsel at the June 3, 2025 hearing. *See generally*, N.T., 6/3/25. Moreover there was sufficient evidence, as determined by the trial court, to establish the elements of indirect criminal contempt beyond a reasonable doubt. At the start of the June 3, 2025 hearing, the parties stipulated that, *inter alia*, "junk or junkyard items and junk vehicles" were routinely being stored "in the frontage of the [real] property outside of the fenced area of the property[,]" "the property had not yet been fully enclosed by a fence or wall[,]" and "a 20-foot wide central aisle through the center of the junkyard for 250 feet [in] length [had] not been opened and established clear of all vehicles and junk." *Id.* at 7-10. Thus, Les's Auto Salvage and Mr. Helm stipulated that the real property was not in compliance with the junkyard and streets zoning ordinance as of the June 3, 2025 hearing. In particular,

- 24 -

the real property violated the zoning ordinances because it was not enclosed with fencing. As of August 17, 2021, Les's Auto Salvage and Mr. Helm understood, and agreed, that they were required to enclose the real property with fencing to comply with the zoning ordinance. Almost four years later, on June 3, 2025, Les's Auto Salvage and Mr. Helm acknowledged that the real property was not fully enclosed with fencing. Mr. Helm blamed the delay on weather, lack of money, and the lack of help. He stated, however, that he knowingly decided to spend available funds on the purchase of a new tract of real property rather than bring the existing real property into compliance with the trial court's order and the zoning ordinances. Les's Auto Salvage and Mr. Helm were offered several opportunities over the course of almost four years to bring the real property into compliance with the zoning ordinances. While we understand that, at times, the compliance efforts may have been delayed by weather conditions and the lack of a work force, the trial court's determination that Mr. Helm acted, both as an individual and on behalf of Les's Auto Salvage, with wrongful intent was not unreasonable, and was supported by the record. *See Commonwealth v. Reese*, 156 A.3d 1250, 1258 (Pa. Super. 2017) (stating, "wrongful intent can be imputed to [an individual] by virtue of the substantial certainty that his [or her] actions will violate the court order"), *appeal denied*, 173 A.3d 1108 (Pa. 2017). Therefore, we discern no error of law or abuse of discretion in the trial court's finding of indirect criminal contempt beyond a reasonable doubt. Consequently, we find that Les's Auto Salvage was afforded the requisite constitutional rights due a

business entity in an indirect criminal contempt matter, and affirm the criminal contempt sanctions imposed against Les's Auto Salvage.

While Les's Auto Salvage, as a business entity, was not entitled to a jury trial in the contempt proceedings, Mr. Helm, as an individual, was entitled to receive the protections of the constitutionally-guaranteed criminal procedure right to a trial by jury in the contempt proceeding because, ultimately, the trial court imposed criminal contempt sanctions. The record, however, does not demonstrate that Mr. Helm, as an individual, was provided his constitutional right to a jury trial in the contempt proceeding.[10]

Although Mr. Helm was entitled to a trial by jury under the circumstances herein, a constitutional claim that he was not afforded this right is, nonetheless, subject to waiver if not properly preserved or raised on appeal. *See Commonwealth v. Knox*, 190 A.3d 1146, 1152 n.5 (Pa. 2018) (stating, "[c]onstitutional claims are subject to waiver regardless of their importance"). Ordinarily, "[i]ssues not raised in the trial court are waived and cannot be raised for the first time on appeal." *See* Pa.R.A.P. 302(a). Contempt proceedings, however, can be constitutionally complex and are structurally problematic given the fact that an individual may not fully recognize that he or she has certain constitutional criminal procedural rights that need to be protected until the trial court imposes a contempt sanction

_____

[10] Moreover, the record contains no evidence that Mr. Helm waived the right to a jury trial prior to June 3, 2025 hearing.

that constitutes a criminal contempt sanction, thereby making clear that the individual had rights to certain constitutionally guaranteed protections. Stated simply, an individual may not fully understand the need to preserve a claim concerning the right to a trial by jury until after a criminal contempt sanction is imposed. It is only after the criminal contempt sanction is imposed and the right to a trial by jury becomes fully recognized, that an individual can be expected to raise a constitutional claim with the trial court in a post-sanction motion. In the case *sub judice*, Mr. Helm did not raise the issue with the trial court regarding his right to a trial by jury in a post-sanction motion. Given that the complex procedural posture of this case raises an issue of first impression for this Court, we are not inclined to find that Mr. Helm forfeited his constitutional claim by failing to raise the issue with the trial court. ***See Commonwealth v. Diaz***, 191 A.3d 850, 855-856 (Pa. Super. 2018) (reiterated that, "our courts have long[-]recognized that the failure to preserve an issue for appeal may be excused when a strong public interest outweighs the need to protect the judicial system from improperly preserved issues"). We are constrained, however, to find that Mr. Helm waived his constitutional claim by failing to raise the issue in his Rule 1925(b) statement or in his appellate brief, and we cannot raise this structural error *sua sponte*.[11]

---

[11] "Structural errors," such as the denial of the right to a trial by jury, when an defendant is entitled to such right, is "a structural defect in the constitution of the trial mechanism" that affects "the entire conduct of the trial from beginning to end, and [denies] the defendant basic constitutional protections

*See Commonwealth v. Colavita*, 993 A.2d 874, 891 (Pa. 2010) (stating, "[w]here the parties fail to preserve an issue for appeal, [this Court] may not address that issue *sua sponte*" and "[t]he rule is no different in the constitutional context"); *see also Commonwealth v. Bonnett*, 239 A.3d 1096, 1106 (Pa. Super. 2020) (stating, "[i]t is well-established that any issue not raised in a Rule 1925(b) statement will be deemed waived for appellate review" (*relying on Commonwealth v. Lord*, 719 A.2d 306, 309 (Pa. 1998)), *appeal denied*, 250 A.3d 468 (Pa. 2021); Pa.R.A.P. 2116(a) (stating, "[n]o question will be considered unless it is stated in the statement of questions involved or is fairly suggested thereby"); Rule 1925(b) Statement, 7/30/25; Les's Auto Salvage's and Mr. Helm's Brief at 2.  Therefore, we affirm the criminal contempt sanctions imposed by paragraphs 1 and 2 of the June 5, 2023 order against Les's Auto Salvage and Mr. Helm.

_____

which ensure that a criminal trial reliably determines guilt or innocence, and, [ensures] that any punishment imposed as a result of the trial is 'fundamentally fair[.]'" *Commonwealth v. Taylor*, 309 A.3d 754, 777 (Pa. 2024).

In federal judicial proceedings, the "plain-error review" rule (Fed.R.Crim.P. 52(b)) permits federal appellate courts to review structural errors that have been forfeited by the party for failure to make a timely assertion of the right. *See Puckett v. United States*, 556 U.S. 129, 135 (2009).  Our Supreme Court, however, abrogated application of the "plain-error review" rule in Pennsylvania.  *See Commonwealth v. King*, 234 A.3d 549, 550 (Pa. 2020), *citing Commonwealth v. Hays*, 218 A.3d 1260, 1267 (Pa. 2019) ( Saylor, C.J., concurring) and *Commonwealth v. Clair*, 326 A.2d 272, 274 (Pa. 1974).

Turning to the sanction that required Les's Auto Salvage and Mr. Helm to pay Honey Brook $10,352.00 in attorneys' fees and costs (Trial Court Order, 6/5/25, at ¶3), we find this sanction to be a compensatory civil sanction. The primary purpose of this sanction was to compensate Honey Brook for the monies expended as a result of the failure by Les's Auto Salvage and Mr. Helm to comply with the permanent injunction order and did not require a purge condition to attach to the sanction. The parties stipulated that "since the date of the July [10, 2023 permanent injunction order, Honey Brook] expended $10,352.00 in [attorneys'] fees related to enforcement and court action in this matter." N.T., 6/3/25, at 11-12. Therefore, the sanction reflected Honey Brook's actual losses.

To support the civil contempt sanction of attorneys' fees and costs, there must be sufficient evidence to support the finding of contempt. As discussed *supra*, to support a finding of civil contempt, Honey Brook was required to prove, by a preponderance of the evidence, that Les's Auto Salvage and Mr. Helm had notice of the July 10, 2023 order, that it's violation of the order was volitional, and that it acted with wrongful intent. ***Cnty. of Fulton***, 292 A.3d at 1004.

Upon review, we discern no error of law or abuse of discretion in the trial court's determination that there was sufficient evidence to support a finding of civil contempt for failure to comply with the July 10, 2023 permanent injunction order by a preponderance of the evidence. As discussed *supra*, Les's Auto Salvage and Mr. Helm had notice of the July 10, 2023 permanent

injunction, and their obligations thereunder, as well as the allegations lodged against them in Honey Brook's motion for contempt. The trial court's determination that Mr. Helm acted, both in his individual capacity and on behalf of Les's Auto Salvage, with wrongful intent was not unreasonable, and was supported by the record. Therefore, we discern no error of law or abuse of discretion in the trial court's finding of civil contempt by a preponderance of the evidence.

Order affirmed.

Judge Beck joins this Opinion.

President Judge Emeritus Panella concurs in the result.

Judgment Entered.

_Benjamin D. Kohler_

Benjamin D. Kohler, Esq.
Prothonotary

Date: 6/30/2026